IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **CLIFFORD LEE GOULSBY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Case No. 21-CV-0289-GKF-SH |
| | ) |
| **JANET DOWLING, Warden,** | ) |
| **RANDY HARDING, Deputy Warden,** | ) |
| **AARON PERUSKIE, Chief of Security,** | ) |
| **THOMAS PRYOR, Shift Lieutenant,** | ) |
| **TYLER MCINTURF, Correctional Officer,** | ) |
| **BRIAN PLOOSTER, Correctional Officer,** | ) |
| **SCOTT CROW, Director, Oklahoma** | ) |
| **Department of Corrections, and** | ) |
| **TAMMY WERNER, Shift Lieutenant,** | ) |
| | ) |
| **Defendants.**[1] | ) |

**OPINION AND ORDER**

This civil rights action is before the Court on the motion to dismiss filed by Defendant Scott Crow (Dkt. 23) and the motion to dismiss filed by Defendants Tammy Werner, Janet

---

[1] In his original complaint, Goulsby named as a defendant "Scott Crow- Director and/or D.O.C. Board of Directors/Corrections." Dkt. 1, Compl. 1, 6. Goulsby completed and submitted a summons so that the complaint could be served on Crow. Dkt. 12, at 2. In the amended complaint, Goulsby does not specifically refer to Crow and instead names the "D.O.C. Board of Directors/Corrections" as a defendant. Because Goulsby provided a summons for Crow, Crow was served a copy of the amended complaint. It is not clear if Goulsby intends to sue Crow, the Board of Directors, or both. For ease of discussion, the Court will refer to Crow and the Board of Directors, collectively, as Crow. However, for reasons explained in the analysis section of this opinion and order, the amended complaint fails to state any plausible claims against either Crow or the Board of Directors. Additionally, the Court has corrected the spelling or provided full names of some defendants named in the amended complaint based on the names reflected in the Defendants' dismissal motions and the Special Report (Dkt. 22). The Clerk of Court shall update the record to reflect Defendants' names as shown in the caption of this opinion and order.

Dowling, Tyler McInturf and Thomas Pryor (Dkt. 27).[2]  Citing Federal Rule of Civil Procedure 12(b)(6), these defendants primarily argue that the amended complaint filed by Plaintiff Clifford Lee Goulsby (Dkt. 7) should be dismissed for failure to state any claims on which relief may be granted.  Goulsby did not file a response to either dismissal motion.  Having carefully considered the allegations in the amended complaint, the Court finds that they are not sufficient to state any plausible claims for relief.  The Court therefore grants both motions and dismisses the amended complaint.

I.      **Plaintiff's allegations and claims**

Goulsby, who appears *pro se*, presently is incarcerated at the Dick Conner Correctional Center (DCCC) in Hominy, Oklahoma.  Dkt. 7, Am. Compl. 2, 11.[3]  The following facts are drawn from the amended complaint and the special report (Dkt. 22) submitted by Crow.[4]

---

[2] The remaining defendants—Brian Plooster, Randy Harding, and Aaron Peruskie—have not been served and have not entered an appearance in this case.  *See* Dkts. 14, 15, 16, 27.

[3] For consistency, the Court's citations refer to the CM/ECF header pagination.

[4] At the Court's direction, Crow submitted a special report (Dkt. 22) pursuant to *Martinez v. Aaron*, 570 F.2d 317 (1978).  Because Movants seek dismissal under Fed. R. Civ. P. 12(b)(6), the Court must measure the sufficiency of the amended complaint by considering facts drawn from only certain materials—namely, the amended complaint, any documents the amended complaint incorporates by reference, and any documents referred to in the amended complaint to the extent those documents are central to Goulsby's claims and the parties do not dispute the authenticity of those documents.  *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).  The Court may consider facts from the special report only to the extent those facts do not refute facts specifically pleaded by Goulsby in the amended complaint.  *Swoboda v. Dubach*, 992 F.2d 286, 290 (10th Cir. 1993).  To the extent the parties disagree on the facts, the Court must accept as true all well-pleaded factual allegations in the amended complaint.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

In February 2021, Goulsby was housed in Unit C, a general population unit. Dkt. 7, Am. Compl. 12-13; Dkt. 22-3, Comprehensive Report 4. On February 27, 2021, Augustine Curtis, Coacoche Ahaisse, and Phillip Johnson—all of whom are validated members of the Indian Brotherhood (IBH), a prison gang classified by the ODOC as a security threat group (STG)—walked out of their unlocked prison cell in Unit A/A, a segregated housing unit (SHU), and stabbed Goulsby nine times with "homemade knives" in the Unit A/C Courtyard. Dkt. 7, Am. Compl. 12-17; Dkt. 22-3, Comprehensive Report 2-3. Goulsby alleges the Unit A/C Courtyard is "predominantly 'black,'" the three IBH prisoners attacked him "because [he] was the first black inmate that [the trio] came into contact with," and the trio "had an ongoing issue with all black individuals." Dkt. 7, Am. Compl. 6-7, 12-18. Goulsby suffered multiple injuries, spent eight days in the hospital, underwent two surgeries relative to a stab wound near his heart, had a stroke on September 7, 2021, and has experienced "severe pain" since the assault. *Id.* at 19.

After the attack on Goulsby, a DCCC officer inspected the locks on the doors of all prison cells used for STG housing. Dkt. 22-3, Comprehensive Report 7. The prison cell occupied by the three IBH prisoners who stabbed Goulsby, and four additional prison cells, "were found to have either a homemade 'roller' device inserted in their door lock or the device in the cell waiting to be inserted into the door lock." *Id.*

Goulsby commenced this action in July 2021, seeking relief under 42 U.S.C. § 1983. Goulsby purports to sue eight defendants in their individual and official capacities: (1) Janet Dowling, the DCCC's Warden; (2) Randy Harding, the DCCC's Deputy Warden; (3) Aaron Peruskie, the DCCC's Chief of Security; (4) Thomas Pryor, a DCCC Shift Lieutenant; (5) Tyler

3

McInturf, a DCCC Correctional Officer; (6) Brian Plooster, a former DCCC Correctional Officer; (7) Tammy Werner, a DCCC Shift Lieutenant; and (8) Scott Crow, Director of the Oklahoma Department of Corrections (ODOC).[5] *Id.* at 2-5.  Though not entirely clear, Goulsby appears to claim that Defendants, collectively and individually, made housing placement decisions that created a substantial risk of inmate-on-inmate violence and failed to adequately protect him from being assaulted by the three IBH prisoners, thereby depriving him of his rights "to equal protection under Federal law" and "to be free from cruel and unusual/inhumane punishment."  Dkt. 7, Am. Compl. 3, 12-17.[6]  Goulsby seeks compensatory and punitive damages and injunctive relief, *id.* at

---

[5] Hereafter, the Court will refer to all eight defendants, collectively as "Defendants," will refer to the first seven defendants, collectively, as "the DCCC Defendants," will refer to those defendants seeking dismissal, collectively, as "Movants," and will refer to the DCCC Defendants seeking dismissal, collectively, as "the DCCC Movants."

[6] Goulsby also claims Defendants violated his rights under an "Act of Congress 1897" and 18 U.S.C. § 1153, as interpreted in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), and *Sharp v. Murphy*, 140 S. Ct. 2412 (2020).  Dkt. 7, Am. Compl. 3.  As is apparent from the allegations in the amended complaint, Goulsby's primary concern is that he suffered injuries after Defendants allegedly failed to protect him from being assaulted by other prisoners.  The Court discerns no legal or factual basis for any purported violations of a non-specific congressional act or a federal statute governing when certain crimes are subject to prosecution in federal court.  To the extent Goulsby asserts violations of his rights under these federal laws, he fails to state any cognizable claims.  Goulsby also asserts violations of his rights under the Oklahoma Constitution.  Dkt. 7, Am. Compl. 3.  A federal court may exercise supplemental jurisdiction over any state-law claims related to federal claims asserted in a federal action.  28 U.S.C. § 1367(a).  But, in most cases, a federal court should decline to exercise supplemental jurisdiction over state-law claims if all federal claims asserted in the same action "disappear early in the litigation."  *Birdwell v. Glanz*, 790 F. App'x 962, 964 (10th Cir. 2020) (unpublished).  Accordingly, the Court first considers whether Goulsby states any plausible federal claims, then, if necessary, considers whether it may be appropriate to exercise supplemental jurisdiction.

4

7.; Dkt. 1, Compl. 8-9. To support his claims, Goulsby identifies specific actions and omissions of each defendant that he alleges led to the stabbing incident and his resulting injuries.

### A. ODOC Director Scott Crow

Goulsby describes Crow as the "lawful Gatekeeper" who "oversees all actions and movements as well as inmate population placement." Dkt. 7. Am. Compl. 12. Goulsby broadly alleges Crow "failed to protect the inmate population altogether" by failing to "consider[] the risk [the ODOC] put several inmates at when making security moves." *Id.* More specifically, Goulsby alleges Crow "did not assess the risk factor by placing (3) three "IBH" Gang Members on a predominantly 'black' inmate populated yard, much less approve the Warden Janet Dowling to put a S.H.U. in the middle of a General Population Unit or a G.P. Unit with General Population inmates that lived amongst the S.H.U. inmates on A/A Pod, Unit A&C" at the DCCC. Dkt. 7, Am. Compl. 12. Finally, he alleges Crow created "th[e] entire conspiracy" that resulted in the stabbing incident. *Id.*

### B. Warden Janet Dowling

Goulsby alleges Dowling "placed every inmate on A&C Unit at substantial risk by putting a [SHU] in the middle of an 'OPEN' General Population Unit." Dkt. 7, Am. Compl. 13. He alleges prisoners in a SHU should have "no contact" with other prisoners "[b]ut there were inmates that lived amongst the S.H.U. inmates that were able to come and go freely in and out of their cell and the A/A Unit." *Id.* Finally, he alleges Dowling "continued to follow the conspiracy from [Crow] and continued to place that conspiracy on the shoulders of her employees." *Id.*

5

### C. Deputy Warden Harding

According to Goulsby, Harding "followed directions from his superiors even though the moves and his directions were wrong and would ultimately cause a problem with the G.P. Population." Dkt. 7, Am. Compl. 13. Goulsby also alleges Harding "continued to place the conspiracy on the shoulders of employees underneath his direction." *Id.*

### D. Chief of Security Aaron Peruskie

Goulsby alleges Peruskie told Goulsby that Peruskie "had no choice in the actions that happened/took place before [Goulsby] got stabbed" and that Peruskie thus "failed to take any action to prevent harm to any of the inmate population." Dkt. 7, Am. Compl. 14. He further alleges Peruskie "continued this whole conspiracy by doing nothing and allowing the plan in motion to move forward." *Id.*

### E. Shift Lieutenants Thomas Pryor and Tammy Werner

Goulsby alleges Pryor and Werner inadequately responded when the IBH prisoners stabbed Goulsby and failed to properly supervise correctional officers who were responsible for monitoring and securing prisoners housed in the SHU. Goulsby alleges that, after he was stabbed, Pryor "unloaded a can of [pepper spray] on the black population while the (3) three IBH Gang Members stood beside [Pryor] with homemade knives still in hand" and Pryor "failed to protect the inmate population by allowing the (3) three IBH Members to retain their weapons." Dkt. 7, Am. Compl. 14. Goulsby further alleges, "By proxy [Pryor] continued the entire conspiracy forward onto other staff members." *Id.*

Goulsby alleges Werner failed to complete "her daily duties" and "took no steps to ensure the protection of the inmate population" because she: (1) failed to prevent the three IBH prisoners who attacked Goulsby from being placed in a two-man prison cell; (2) did not ensure that two correctional officers were present when SHU prisoners were allowed to shower; and (3) failed to "make sure that her officers checked the locking devices on the cell door" or "properly secure[d] the cell door themselves." Dkt. 7, Am. Compl. 15. Goulsby alleges Werner "furthered the conspiracy thru all of her actions and inactions." *Id.*

### F. Correctional Officers Plooster and McInturf

Goulsby alleges two correctional officers who were on duty before or during the attack, McInturf and Plooster, failed to perform assigned security tasks that could have prevented the attack. He alleges Plooster "fully knew his duties and what was expected of him while attending his post" but "did not have a secondary officer with him as is required when showering SHU inmates." Dkt. 7, Am. Compl. 16. He further alleges, "After each SHU inmate had showered, it was [Plooster's] duty to secure the doors and he completely failed to do so as he allowed the (3) three IBH members to secure their own door allowing them to "RIG" their door for the premeditated attack" against Goulsby. *Id.* According to Goulsby, "Plooster continued the entire conspiracy by being derelict of his duties." *Id.*

Goulsby alleges McInturf began his shift on the morning of the stabbing incident but "fail[ed] to fully perform all of the duties required of him." *Id.* at 17. According to Goulsby, if McInturf had "properly checked the doors of every cell on A&C unit, [McInturf] would have found that there were doors that were not secured properly and [that] allowed these "STG" inmates to

"pop-out" of their cell." Dkt. 7, Am. Compl. 17. Goulsby further alleges that when he was stabbed "right in front of [McInturf], [McInturf] ran back to his office on A/A & A/B side instead of using his non-lethal state issued protective measures." *Id.* Goulsby alleges McInturf "furthered the entire conspiracy by not properly and adequately fulfilling his duties." *Id.*

## II.     Discussion

As previously stated, Movants seek dismissal of the amended complaint under Fed. R. Civ. P. 12(b)(6). They contend (1) Goulsby failed to exhaust administrative remedies before filing suit, as required by 42 U.S.C. § 1997e(a); (2) Goulsby fails to state any plausible claims for relief against them; (3) Goulsby cannot seek damages as to any official-capacity claims asserted against them because they are state officials; and (4) they are entitled to qualified immunity as to any individual-capacity claims asserted against them. Dkt. 23, Mot. to Dismiss 4-13; Dkt. 27, Mot. to Dismiss 4-15.

### A.     Dismissal standard

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all the well-pleaded factual allegations of the complaint and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.*, 550 U.S. at 555, 570. Dismissal is appropriate "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Id.* at 558. When, as here, a plaintiff appears *pro se*, a court must liberally construe the complaint. *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007). This "means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

But the rule of liberal construction does not relieve a *pro se* plaintiff of his or her "burden [to] alleg[e] sufficient facts on which a recognized legal claim could be based." *Hall*, 935 F.2d at 1110. And, in applying the rule of liberal construction, a court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997).

    B.    Analysis

To survive a motion to dismiss for failure to state claim, a plaintiff seeking relief under § 1983 must plausibly allege: "(1) a violation of rights protected by the United States Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia." *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002) (alteration in original) (citation omitted). A plaintiff seeking relief under § 1983 may sue a "person" acting under color of state law in his or her individual or official capacity. "[A] suit against a state official in his or her official capacity is not a suit against the official, but rather is a suit against the official's office.'" *Brown v. Montoya*, 662 F.3d 1152, 1163 n.8 (10th Cir. 2011) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). In contrast, "[i]ndividual capacity 'suits seek to impose personal liability upon a government official for actions [the official] takes under color of state law.'" *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).

"A § 1983 defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability." *Brown*, 662 F.3d at 1163.

> Personal liability "under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th

9

> Cir. 1997).
>
> Supervisory liability "allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, [or] implements . . . a policy . . . which subjects, or causes to be subjected that plaintiff to the deprivation of any rights . . . secured by the Constitution." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010), *cert. denied*, 563 U.S. 960, 131 S. Ct. 2150, 179 L.Ed.2d 935 (2011) (quotation omitted).
>
> Section 1983 does not authorize liability under a theory of respondeat superior. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Instead, to establish supervisory liability, a plaintiff must show that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds*, 614 F.3d at 1199.

*Brown*, 662 F.3d at 1163-64 (footnote omitted); *see also Schneider v. Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (requiring a plaintiff to show an "affirmative link" between the supervisor and the alleged constitutional violation).

Having carefully considered the allegations in the amended complaint, the Court finds it most reasonable to read those allegations as asserting: (1) an Eighth Amendment deliberate-indifference claim against each defendant, in his or her individual capacity; (2) a Fourteenth Amendment equal-protection claim against each defendant, in his or her individual capacity; and (3) a conspiracy claim under 42 U.S.C. § 1985(3) based on Defendants' alleged participation in a

conspiracy to violate Goulsby's Eighth and Fourteenth Amendment rights.[7] However, for the following reasons, none of these claims survives the plausibility standard.[8]

### 1. Eighth Amendment deliberate-indifference claim

Liberally construed, the amended complaint primarily asserts an Eighth Amendment deliberate-indifference claim based on Defendants' alleged individual and collective failures to protect Goulsby from being stabbed by other prisoners.

As relevant here, the Eighth Amendment obligates prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). But not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Rather, to establish a cognizable Eighth Amendment claim based on a prison official's failure to protect a

---

[7] Movants argue, in part, that Goulsby cannot seek damages as to any claims asserted against them in their official-capacities because they are state officers and a state is not a "person" within the meaning of § 1983. Dkt. 23, Mot. to Dismiss 13; Dkt. 27, Mot. to Dismiss 14-15. Even liberally construed, the Court does not read the allegations in the amended complaint as asserting any plausible official-capacity claims against Defendants. *See Melo v. Hafer*, 912 F.2d 628, 636 (3d Cir. 1990) ("It does not follow that every time a public official acts under color of state law, the suit must of necessity be one against the official in his or her official capacity.") Instead, the Court finds it most reasonable to read the amended complaint as seeking to impose personal liability against each defendant based on their alleged acts and omissions. However, to the extent the amended complaint could be construed as asserting any official-capacity claims, the Court dismisses the amended complaint for failure to state a claim on which relief may be granted.

[8] Because the amended complaint fails to state any plausible claims, the Court declines to address Movants' assertions that Goulsby failed to exhaust administrative remedies and that Movants are entitled to qualified immunity.

prisoner from an assault by another prisoner, a plaintiff must show (1) that he or she "is incarcerated under conditions posing a substantial risk of serious harm," and (2) that the prison official had knowledge of an excessive risk to the prisoner's safety and disregarded that risk. *Farmer*, 511 U.S. at 834, 837.  Critically, "an official's failure to alleviate a significant risk that [the official] should have perceived but did not" will not support the "deliberate indifference" necessary to show that the official acted or failed to act with "a 'sufficiently culpable state of mind.'"  *Id.* at 834-38.  "The Supreme Court has explained that 'deliberate indifference entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result.'" *Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003) (alteration in original) (quoting *Farmer*, 511 U.S. at 835)).

There is no dispute in this case that three IBH prisoners housed in a SHU moved "freely" from their prison cell and brutally attacked Goulsby, leaving him with significant injuries.  Dkt. 7, Am. Compl. 12-19; Dkt. 22-3, Comprehensive Report 2-3; Dkt. 27, Mot. to Dismiss 8 n.3.  But, for several reasons, the Court agrees with Movants that the allegations in the amended complaint do not plausibly show that Defendants deprived Goulsby of any constitutional rights by failing to prevent that attack.  First, Goulsby's broad allegations against Crow fail to show that Crow personally participated, either as an individual or in a supervisory capacity, in the alleged failure to protect Goulsby from harm.  Essentially, Goulsby seeks to hold Crow liable because he "oversees" the entire ODOC.  Dkt. 7, Am. Compl. 12.  But Goulsby's own allegations suggest that Crow neither assessed any risk regarding the placement of the three IBH prisoners in Unit A/A at

the DCCC nor "approved" Dowling's decision as to that housing placement. Dkt. 7, Am. Compl. 12. Goulsby thus fails to state a plausible Eighth Amendment claim against Crow.

Likewise, he fails to state any plausible claims against the DCCC Defendants. To be fair, several of Goulsby's allegations plausibly show that the DCCC Defendants knew, or should have been aware, that the three IBH prisoners who assaulted him posed a risk of harm to other inmates. For example, Goulsby alleges that those three prisoners were validated members of the IBH, a known security threat group (STG), and that those three prisoners were housed in a segregated housing unit (SHU), presumably to keep them apart from prisoners in the general population unit. Dkt. 7, Am. Compl. 12-17. Goulsby also alleges that the DCCC's own policies required that two correctional officers supervise SHU prisoners during shower time and that at least one correctional officer check prison cell doors in the SHU to ensure that those doors are secured. *Id.* However, even accepting these allegations as true, several of these same allegations show that those DCCC Defendants most likely responsible for housing assignments and risk assessments relative to STGs at the DCCC—namely, Dowling, Harding, and Peruskie—took reasonable steps to alleviate known risks to prisoners in general population by placing the IBH members in the SHU and imposing extra security precautions when prisoners housed in the SHU were permitted access to common areas of the prison. On balance, the allegations in the amended complaint fail to plausibly allege that Dowling, Harding, or Peruskie acted (or failed to act) with deliberate indifference. *See Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

Goulsby's allegations as to the remaining DCCC Defendants—Pryor, Werner, Plooster, and McInturf—present a closer question. But those allegations, even accepted as true, suggest at most that all four may have negligently failed to enforce or follow the DCCC's policies regarding supervision of SHU prisoners, particularly the policy requiring correctional officers to personally ensure that cell doors in the SHU were locked. Negligence, however, is not deliberate indifference. *Farmer*, 511 U.S. at 835; *Verdecia*, 327 F.3d at 1177; *see also Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (noting that when a plaintiff must establish deliberate indifference, "[a] showing of simple or even heightened negligence will not suffice"). In other words, even accepting Goulsby's position that Pryor, Werner, Plooster, and McInturf negligently failed to perform their duties, and thereby failed to protect him from being stabbed, the allegations in the amended complaint do not plausibly show that these four DCCC Defendants knowingly disregarded an excessive risk to Goulsby's safety.

Based on the foregoing, the Court concludes that the amended complaint fails to state any plausible Eighth Amendment claims against Defendants.

### 2. Fourteenth Amendment equal-protection claim

Goulsby also appears to allege Defendants violated his Fourteenth Amendment right to equal protection. Dkt. 7, Am. Compl. 3, 12-17. Ordinarily, "[t]o establish a violation of the Equal Protection Clause, a plaintiff must allege that a defendant acted with the intent to discriminate against the plaintiff because of the plaintiff's protected status." *Ingram v. Cooper*, 163 F. Supp. 3d 1133, 1139 (N.D. Okla. 2016).

In the amended complaint, Goulsby clearly identifies himself as "black." Dkt. 7, Am. Compl. 18. But beyond that, the factual basis of his equal-protection claim is not clear. Generously construing the amended complaint, the Court finds only two scattered allegations that may be related to the equal-protection claim. First, Goulsby alleges Crow did not adequately "assess the risk factor by placing (3) three 'IBH' Gang Members on a predominantly 'black' inmate populated yard." Dkt. 7, Am. Compl. 12. As previously discussed, Goulsby's allegations as a whole do not plausibly show that Crow could be personally liable for any decision to place the three IBH prisoners in a SHU near Goulsby's general population unit at the DCCC. In any event, even accepting as true Goulsby's bare assertion that Crow somehow participated in this placement decision, Goulsby's bare assertion that Crow failed to adequately consider race in making that decision does not state a plausible Fourteenth Amendment claim against Crow.

Second, Goulsby alleges Pryor responded to the stabbing incident by using pepper spray "on the black population while the (3) three IBH Gang Members stood beside [Pryor] with homemade knives still in hand" and Pryor "failed to protect the inmate population by allowing the (3) three IBH members to retain their weapons." Dkt. 7, Am. Compl. 14. Viewing this allegation, and reasonable inferences therefrom, in Goulsby's favor, the Court discerns no plausible basis for an equal-protection claim. Significantly, even assuming Pryor sprayed other black inmates with pepper spray in the immediate aftermath of the stabbing or did not instantly confiscate the homemade knives from Goulsby's attackers, Goulsby does not allege that Pryor "acted with the intent to discriminate against" Goulsby based on Goulsby's race. *Ingram*, 163 F. Supp. 3d at 1139. He thus fails to state a plausible equal-protection claim against Pryor.

15

In sum, neither these two potentially related allegations against Crow and Pryor nor any other allegations in the amended complaint may be reasonably construed as supporting a plausible Fourteenth Amendment equal-protection claim against any Defendants.[9]

### 3. Section 1985(3) conspiracy claim

Goulsby alleges Defendants conspired to violate his Eighth and Fourteenth Amendment rights. Dkt. 7, Am. Compl. 12-17. The DCCC Movants construe his allegations of a conspiracy as asserting a claim under 42 U.S.C. § 1985(3). Dkt. 27, Mot. to Dismiss 9-11. To state a plausible conspiracy claim under this statute, a plaintiff must identify facts showing "(1) a conspiracy; (2) to deprive [the] plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). As just discussed, there are no allegations in the amended complaint that plausibly show Defendants, either individually or collectively, deprived Goulsby of his rights under the Eighth or Fourteenth Amendments, much less that Defendants conspired to do so out of racial animus toward Goulsby. Goulsby thus fails to state any plausible claim for relief under § 1985(3).

---

[9] Goulsby also alleges the three IBH prisoners who stabbed Goulsby "had an ongoing issue with all black individuals" and stabbed Goulsby because he "was the first black inmate that they came into contact with." Dkt. 7, Am. Compl. 18. Even accepting these allegations as true, the prisoners who stabbed Goulsby are not defendants in this § 1983 action. Nor could they be proper defendants in this action because they did not act under color of state law when they attacked Goulsby.

### III. Conclusion

For the reasons stated, the Court concludes that the amended complaint fails to state any plausible claims for relief against Defendants that could be remedied under 42 U.S.C. § 1983. The Court therefore grants the motion to dismiss filed by Defendant Scott Crow (Dkt. 23), grants the motion to dismiss filed by Defendants Tammy Werner, Janet Dowling, Tyler McInturf and Thomas Pryor (Dkt. 27), dismisses the amended complaint, with prejudice, as to all federal claims asserted against Defendants, and dismisses the amended complaint, without prejudice, as to any state-law claims asserted against Defendants.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Clerk of Court shall update the record to reflect the names of the defendants as reflected in the caption of this opinion and order.

2. The motion to dismiss filed by Defendant Scott Crow (Dkt. 23) is **granted**.

3. The motion to dismiss filed by Defendants Tammy Werner, Janet Dowling, Tyler McInturf and Thomas Pryor (Dkt. 27) is **granted**.

4. The amended complaint (Dkt. 7) is **dismissed with prejudice** as to all federal claims asserted against Defendants and **dismissed without prejudice** as to any state-law claims asserted against Defendants.

5. This is a final order terminating this action

6. A separate judgment shall be entered in this matter.

**DATED** this 23rd day of September, 2022.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE